# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

# CRIMINAL COVER SHEET

**FILED**
Mar 09 2021
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

***Instructions:*** *Effective November 1, 2016, this Criminal Cover Sheet must be completed and submitted, along with the Defendant Information Form, for each new criminal case.*

| | |
|---|---|
| **CASE NAME:** USA v. BHUPINDER BHANDARI | **CASE NUMBER:** CR 20-00374-CRB |
| **Is This Case Under Seal?** | Yes    No ✔ |
| **Total Number of Defendants:** | 1 ✔    2-7    8 or more |
| **Does this case involve ONLY charges under 8 U.S.C. § 1325 and/or 1326?** | Yes    No ✔ |
| **Venue (Per Crim. L.R. 18-1):** | SF ✔    OAK    SJ |
| **Is this a potential high-cost case?** | Yes    No ✔ |
| **Is any defendant charged with a death-penalty-eligible crime?** | Yes    No ✔ |
| **Is this a RICO Act gang case?** | Yes    No ✔ |
| **Assigned AUSA (Lead Attorney):** William Frentzen | **Date Submitted:** March 9, 2021 |

**Comments:**

Superseding indictment for 20-cr-0374 CRB

RESET FORM    SAVE PDF

Form CAND-CRIM-COVER (Rev. 11/16)

# United States District Court

FOR THE

**NORTHERN DISTRICT OF CALIFORNIA**

VENUE: SAN FRANCISCO

---

UNITED STATES OF AMERICA,

V.

CR 20-0374 CRB

BHUPINDER BHANDARI

DEFENDANT(S).

---

**FILED**

Mar 09 2021

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

## SUPERSEDING INDICTMENT

18 U.S.C. § 371 – Conspiracy to Pay and Receive Health Care Kickbacks;
42 U.S.C. § 1320a-7b(b)(1)(A) – Anti-Kickback Statute;
18 U.S.C. § 2 –Aiding and Abetting;
18 U.S.C. § 1014 – False Statements to a Financial Institution;
18 U.S.C. §§ 981(a)(1)(C) and 982(a)(7) and 28 U.S.C. § 2461(c) – Forfeiture Allegation

---

A true bill.

/s/ Foreperson of the Grand Jury

Foreman

Filed in open court this __9th__ day of March, 2021.

Melinda K. Lock        /s/ M Lock
                                         Clerk

                                         Bail, $ __No Process__

/s/ Sallie Kim
Magistrate Judge Sallie Kim

STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

FILED

Mar 09 2021

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 3:20-cr-00374-CRB |
| Plaintiff, | |
| v. | |
| BHUPINDER BHANDARI, | VIOLATIONS:<br>18 U.S.C. § 371 – Conspiracy to Pay and Receive Health Care Kickbacks;<br>42 U.S.C. § 1320a-7b(b)(1)(A) – Anti-Kickback Statute;<br>18 U.S.C. § 2 – Aiding and Abetting;<br>18 U.S.C. § 1014 – False Statements to a Financial Institution;<br>18 U.S.C. §§ 981(a)(1)(C) and 982(a)(7) and 28 U.S.C. § 2461(c) – Forfeiture Allegation |
| Defendant. | |
| | SAN FRANCISCO |

FIRST SUPERSEDING INDICTMENT

The Grand Jury charges:

At all times relevant to this Indictment, unless otherwise indicated:

<u>Introductory Allegations</u>

<u>The Defendant</u>

1.   Defendant BHUPINDER BHANDARI is a 62-year old medical doctor, specializing in internal medicine, licensed to practice medicine in California. He had medical offices in Hayward and

FIRST SUPERSEDING INDICTMENT           1

Pleasanton, California, and was believed to be a resident of Pleasanton, California, in the Northern District of California.

### The Medicare Program ("Medicare")

2. Medicare was a federally funded health care program that provided benefits to persons 65 years of age or older, or who were disabled. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries." Each beneficiary was given a unique health insurance claim number ("HICN"). Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS").

3. Medicare was a "Federal health care program" as defined by Title 42, United States Code, Section 1320a-7b(f), and a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

4. A home health agency was an entity that provided health services, including but not limited to skilled nursing, physical and occupational therapy, and speech pathology services to homebound patients in their homes.

5. A home hospice agency was an entity that provided palliative or end-of-life care if a physician certified that the patient was terminally ill or had a life expectancy of six months or less. Hospice care was usually given in the patient's home but may also be covered in a hospice inpatient facility.

6. Medicare was divided into multiple parts with separate coverages, including hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D). The services at issue in this indictment were covered by Part A and Part B.

7. Medicare "Part A" covered certain eligible home health care and home hospice costs for medical services provided by home health and hospice agencies to beneficiaries who required home health services because of an illness, injury, or medical condition that caused them to be homebound or home hospice care. Part A covered services included physical therapy, occupational therapy, and skilled nursing services. Payments made for home health or hospice services under Medicare Part A were typically made directly to a home health or home hospice agency or provider based on claims submitted

FIRST SUPERSEDING INDICTMENT                 2

to Medicare for qualifying services that were provided to eligible beneficiaries, rather than directly to the beneficiaries.

8.  Medicare "Part B" covered non-institutional care, including certain physician services, outpatient services, and other services that were medically necessary, such as home visits, physician certification/recertification of a beneficiary receiving home health services, and physician supervision of a patient receiving home health services.

9.  Safeguard Services, LLC ("Safeguard") was the Zone Program Integrity Contractor for CMS for Medicare Part A and Part B claims in Northern California through April 2018. In May 2018, Qlarant Integrity Solutions ("Qlarant") assumed the role of the Uniformed Program Integrity Contractor for CMS in Northern California. Safeguard and then Qlarant received and processed Medicare Part A and Part B claims originating in Northern California.

10. Physicians, companies, and other health care providers that provided items and services to Medicare beneficiaries were referred to as Medicare "providers." To participate in Medicare, providers were required to submit an application and execute a written provider agreement, known as CMS Form 855, in which the providers agreed to abide by the policies, procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, were required to abide by all provisions of the Social Security Act, the regulations promulgated under the Social Security Act, and applicable policies, procedures, rules, and regulations issued by CMS and its authorized agents and contractors.

11. The application included certifications that the provider agreed to abide by the Medicare laws, regulations, and program instructions, and that the provider understood that payment of a claim by Medicare is conditioned upon the claim and underlying transaction complying with these laws, regulations, and program instructions, including the Federal Anti-Kickback Statute, which prohibited the knowing and willful payment of remuneration to induce or reward patient referrals or the generation of business involving any item or service to federal healthcare programs. Accordingly, Medicare would not pay claims procured through kickbacks or bribes. The application also contained a certification that the provider would not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and would not submit claims with deliberate ignorance or with reckless disregard

of their truth or falsity. Providers were given and provided with online access to Medicare manuals and service bulletins describing proper billing procedures, billing rules, and regulations.

12. If Medicare approved a provider's application, Medicare assigned the provider a Medicare Provider Identification Number ("PIN" or "provider number"). A provider who was assigned a Medicare PIN and provided items or services to beneficiaries was able to submit claims for reimbursement to the Medicare contractor/carrier that included the PIN assigned to that medical provider. Payments under the Medicare program were often made directly to the provider of the goods or services, rather than to the Medicare beneficiary. This payment occurred when the provider submitted the claim to Medicare for payment, either directly or through a billing company.

13. A Medicare claim was required to set forth, among other things, the beneficiary's name and Medicare number, the items or services provided, the date the items or services were provided, the charge for the item or service, the beneficiary's diagnosis, the name of the physician or provider who ordered the items or services, and the name of the physician or provider who provided the items or services. Providers conveyed this information to Medicare by submitting claims using billing codes and modifiers.

14. A provider could submit a claim for reimbursement to Medicare either electronically or using a form. Every claim submitted by, or on behalf of, a provider certified that the information on the claim form was truthful and that the services were reasonable and necessary to the health of the Medicare beneficiary. Medicare only reimbursed providers for services and procedures that were medically necessary and reasonable.

15. Medicare Part A covered, among other things, eligible home health services, such as intermittent skilled nursing care, physical therapy, and continued occupational services. Medicare Part A also covered, among other things, eligible home hospice services. These services, and others covered by Medicare, were commonly provided at the beneficiaries' homes. In this sense, home health care differed from care provided at health care facilities where the patient may reside or stay for extended periods, such as skilled nursing facilities and other inpatient facilities.

16. Medicare Part A reimbursed participating home health agencies for home health services provided to a Medicare beneficiary only if the beneficiary was eligible for home health benefits. A

FIRST SUPERSEDING INDICTMENT                4

beneficiary qualified for home health services only if, among other requirements, (1) the Medicare beneficiary was under the care of a physician who specifically determined a need for home health services and established a plan of care; (2) the Medicare beneficiary was confined to the home, also referred to as "homebound", and a physician certified the Medicare beneficiary was homebound; (3) the Medicare beneficiary needed, and a physician certified that the beneficiary needed, skilled nursing services, physical therapy, speech therapy, or occupational therapy; (4) the beneficiary must have received services under the plan of care established and reviewed by a physician; and (5) the beneficiary must have had a face-to-face encounter with a physician or allowed non-physician practitioner.

17. As a condition for payment, a physician must have certified that the beneficiary was eligible for Medicare home health services based on the above criteria and the physician who established the plan of care must have signed and dated the certification. CMS did not require a specific form or format for the certification so long as the physician certified that the five requirements listed above were met.

18. For a beneficiary to be eligible to receive covered home health services, a physician must have certified, among other things, that the patient was confined to his/her home. In order for a beneficiary to be considered "homebound" or "confined to the home", the beneficiary must have either (1) because of illness or injury, needed the aid of supportive devices such as crutches, canes, wheelchairs, and walkers, the use of special transportation, or the assistance of another person in order to leave their place of residence; or (2) had a condition such that leaving their home was medically contraindicated. In addition, there must have existed a normal inability to leave the home and leaving the home must have required a considerable and taxing effort.

19. Medicare required that the homebound determination be the result of a face-to-face consultation. A physician must have conducted the consultation, or it must have been done with one of the following under the supervision of the physician: a nurse practitioner, a certified nurse midwife, or a physician assistant. As part of the physician's certification, the physician must have certified that the face-to-face encounter occurred no more than 90 days prior to the home health start of care date or within 30 days of the start of home health care, and the encounter was related to the primary reason the patient required home health services. The certifying physician must have also documented the date of

the encounter.

20. Medicare was generally billed for home health services in 60-day periods referred to as "episodes." These episodes covered the services provided by home health care in those 60-day windows. If a beneficiary continued to require home health services, another physician certification (or "recertification") was required for each subsequent episode. The recertification must have been signed and dated by the physician who reviewed the plan of care and indicated that there was a continued need of home health services because the beneficiary was confined to the home and was in need of skilled services.

21. Medicare Part B covered expenses for physician certification and recertification of a home-health beneficiary for Medicare-covered home health services under a home health plan of care. Physician claims for certification/recertification were not considered to be for "Medicare- covered" home health services if the home health agency claim itself was non-covered because the certification/recertification of eligibility was not complete, or because the beneficiary was ineligible, or there was insufficient documentation to support the beneficiary was eligible, for the Medicare home health benefit.

22. Medicare Part B also covered physician care plan oversight services when certain requirements were met. Care plan oversight ("CPO") involved supervision of patients under care of home health agencies or hospices that required complex and multidisciplinary care modalities involving regular physician development and/or revision of care plans, review of subsequent reports of patient status, review of laboratory and other studies, communication with other health professionals not employed in the same practice who are involved in the patient's care, integration of new information into the care plan, and/or adjustment of medical therapy. Medicare covered such services for home health and hospice patients when certain requirements were met, including: (1) the beneficiary must have required complex or multi-disciplinary care modalities requiring ongoing physician involvement in the patient's plan of care; (2) the CPO services should have been furnished during the period in which the beneficiary was receiving Medicare covered home health or hospice services; (3) the physician furnished at least 30 minutes of care plan oversight within the calendar month for which payment was claimed (low intensity services included as part of other evaluation management services did not count

towards this requirement); (4) the physician provided a covered physician service that required a face-to-face encounter with the beneficiary within the six months immediately preceding the first CPO service; (5) the physician did not have a significant financial or contractual interest in the home health agency; and (6) the physician billing for the CPO must have documented in the patient's record the services furnished and the date and length of time associated with this service.

23. For a patient to have been eligible to receive covered home hospice services, a hospice doctor or a patient's regular physician must have certified that the patient was terminally ill and had six months or less to live. After six months, a patient could continue to get hospice care as long as the hospice medical director or hospice doctor recertified (at a face-to-face meeting) that the patient was still terminally ill.

24. Medicare regulations required providers enrolled with Medicare to maintain complete and accurate patient medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for payment were submitted by the physician. Medicare required complete and accurate patient medical records so that Medicare could verify that the services were provided as described on the claim form. These records were required to be sufficient to permit Medicare, through its contractors, to review the appropriateness of Medicare payments made to the health care provider.

25. Medicare paid for claims only if the items or services were medically reasonable, medically necessary for the treatment or diagnosis of the patient's illness or injury, documented, and actually provided as represented to Medicare. Medicare would not pay for items or services that were procured through kickbacks and bribes.

Relevant Entities and Individuals

26. CO-CONSPIRATOR 1 ("CC-1"), is a 35-year-old U.S. citizen who is believed to reside in Livermore, California.

27. AMITY HOME HEALTH CARE, Inc., ("Amity") was a home health agency ("HHA") located in Hayward, California. California Secretary of State Records indicated that CC-1 was the President and CEO of Amity, which was incorporated on April 19, 2011. According to this

1  investigation and based on patient census size, Amity was the largest HHA in the San Francisco Bay
2  Area.
3      28.    ADVENT CARE, Inc., ("ADVENT") was a hospice company located in Hayward,
4  California.  California Secretary of State Records indicated that CC-1 was the Chief Executive Officer
5  of Advent, which was incorporated on March 24, 2015.
6      29.    MISSION NATIONAL BANK was a financial institution, as that term is defined in Title
7  18, United States Code, Section 20, the deposits of which were insured by the Federal Deposit Insurance
8  Corporation ("FDIC").

### COUNT ONE

### Conspiracy to Pay and Receive Health Care Kickbacks
### (18 U.S.C. § 371)

12     30.    Paragraphs 1 through 29 of this First Superseding Indictment are re-alleged and
13  incorporated by reference as though fully set forth herein:
14     31.    From in our around May, 2014, and continuing through at least in or around August,
15  2019, the exact dates being unknown to the Grand Jury, in the Northern District of California, and
16  elsewhere, the defendant, BHUPINDER BHANDARI, did willfully and knowingly combine, conspire,
17  and agree with others, known and unknown to the Grand Jury, to commit certain offenses against the
18  United States, that is:

   a. to knowingly and willfully solicit and receive any remuneration (including any kickback, bribe, and rebate) directly and indirectly, overtly and covertly, in cash and in kind in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by Medicare, a Federal health care program as defined in Title 18, United States Code, Section 24(b), in violation of 42 U.S.C. § 1320a-7b(b)(1)(A).

   b. to knowingly and willfully offer and pay any remuneration (including any kickback, bribe, and rebate) directly and indirectly, overtly and covertly, in cash and in kind in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part

by Medicare, a Federal health care program as defined in Title 18, United States Code, Section 24(b), in violation of 42 U.S.C. § 1320a-7b(b)(2)(A).

### The Purpose of the Conspiracy

32. It was the purpose of the conspiracy for defendant BHUPINDER BHANDARI and his co-conspirators to unlawfully enrich themselves and others by offering, paying, soliciting, and receiving kickbacks and bribes in exchange for Medicare beneficiary referrals to Amity for home health services and to Advent for home hospice services, which were paid for by Medicare.

### The Manner and Means of the Conspiracy

33. The manner and means by which the defendant sought to accomplish the purpose of the conspiracy included, among other things:

   a. BHUPINDER BHANDARI, CC-1, and others, known and unknown to the Grand Jury, communicated by text message and other means about BHUPINDER BHANDARI's referral of individuals, including Medicare beneficiaries, to Amity and Advent in exchange for payments of kickbacks and bribes.

   b. CC-1, Amity, Advent, and employees of Amity and Advent, and other individuals acting at the direction of CC-1, Amity, and Advent, known and unknown to the Grand Jury, paid and caused the payment of kickbacks and bribes in exchange for BHUPINDER BHANDARI's referral of Medicare beneficiaries to Amity and Advent. These payments were, at least in part, in the form of cash payments and checks paid from accounts in the name of Amity and Advent, and made payable to BHUPINDER BHANDARI.

   c. CC-1, Amity, Advent, and employees of Amity and Advent, and other individuals acting at the direction of CC-1, Amity, and Advent, known and unknown to the Grand Jury, disguised the kickbacks and bribes to BHUPINDER BHANDARI as medical directorship fees or consulting fees, among other things.

   d. CC-1, Amity, Advent, and employees of Amity and Advent, and other individuals acting at the direction of CC-1, Amity, and Advent, known and unknown to the Grand Jury, would submit or cause the submission of claims to Medicare through Amity for home

FIRST SUPERSEDING INDICTMENT           9

health services that Amity purportedly provided to the beneficiaries and through Advent for home hospice services that Advent purportedly provided to the beneficiaries, whom BHUPINDER BHANDARI referred to Amity and Advent, respectively, through kickbacks and bribes.  BHUPINDER BHANDARI was listed as the attending provider on these claims.

  e. Medicare made payments to Amity and Advent based upon claims for home health services and home hospice services, respectively, purportedly provided to these Medicare beneficiaries whom BHUPINDER BHANDARI referred through kickbacks and bribes.

### Overt Acts

34. In furtherance of the conspiracy, and to accomplish its purposes and objects, at least one of the co-conspirators committed, or caused to be committed, in the Northern District of California, the following overt acts, among others:

  a. On or about April 3, 2017, CC-1 and others affiliated with Amity paid and caused to be paid check number 5374, in the amount of $3,000, from an account in the name of Amity Home Health Care Inc., with an account number ending in 3890, to BHUPINDER BHANDARI, in exchange for BHUPINDER BHANDARI referring Medicare beneficiaries for home health services;

  b. On or about April 6, 2017, BHUPINDER BHANDARI and CC-1 exchanged messages in which they discussed, in sum and substance, among other things, BHUPINDER BHANDARI's need to "get paid today" due to upcoming property taxes and CC-1's promise to bring checks for both Amity and Advent.

  c. On or about April 6, 2017, CC-1 and others affiliated with Amity paid and caused to be paid check number 0408, in the amount of $3,000, from an account in the name of Advent Care Inc., with account number ending in 7516, to BHUPINDER BHANDARI, in exchange for BHUPINDER BHANDARI referring Medicare beneficiaries for home hospice services;

  d. On or about April 7, 2017, BHUPINDER BHANDARI deposited or caused to be deposited Amity check No. 5374 for $3,000 and Advent check No. 0408 for $3,000 into

BHUPINDER BHANDARI's Bank of America account ending 1349.

e. On or about April 10, 2017, BHUPINDER BHANDARI and CC-1 exchanged messages in which they discussed, in sum and substance, among other things, CC-1's request for patient referrals by asking BHUPINDER BHANDARI to "Pls make sure Patients to me."

f. On April 18, 2017, CC-1 sent a text message to BHUPINDER BHANDARI that stated "Hellllo Also pls send me More patients."

g. On May 24, 2017, BHUPINDER BHANDARI and CC-1 exchanged messages in which they discussed, in sum and substance, among other things, CC-1's request to "Send me More" patients, to which BHUPINDER BHANDARI responded "Ok."

h. In or about April 2017, CC-1, Amity, employees of Amity, and other individuals acting at the direction of CC-1 and Amity, known and unknown to the grand jury, submitted claims to Medicare for at least nine beneficiaries whom BHUPINDER BHANDARI had referred to Amity, with initials W.A., S.W., A.T., R.L., H.W., M.W., J.C., S.E., and P.P.

i. In or about April 2017, CC-1, Advent, employees of Advent, and other individuals acting at the direction of CC-1 and Advent, known and unknown to the grand jury, submitted claims to Medicare for at least seven beneficiaries whom BHUPINDER BHANDARI had referred to Advent, with initials: F.S., D.R., H.P., R.G., S.P., F.H., G.R.

j. On or about July 5, 2017, CC-1 and others affiliated with Amity paid and caused to be paid check number 5756, in the amount of $3,000, from an account in the name of Amity Home Health Care Inc., with an account number ending in 3890, to BHUPINDER BHANDARI, in exchange for BHUPINDER BHANDARI referring Medicare beneficiaries for home health services;

k. On or about July 5, 2017, CC-1 and others affiliated with Advent paid and caused to be paid check number 0531, in the amount of $3,500, from an account in the name of Advent Care Inc., with an account number ending in 7516, to BHUPINDER BHANDARI, in exchange for BHUPINDER BHANDARI referring Medicare beneficiaries for home hospice services;

l. On or about July 6, 2017, BHUPINDER BHANDARI deposited or caused to be

FIRST SUPERSEDING INDICTMENT        11

deposited AMITY check No. 5756 for $3,000 into BHUPINDER BHANDARI's Bank of America account ending 1349.

m. On or about July 18, 2017, BHUPINDER BHANDARI deposited or caused to be deposited Advent check No. 0531 for $3,500 into BHANDARI's Bank of America account ending 1349.

n. In or about July 2017, CC-1, Amity, employees of Amity, and other individuals acting at the direction of CC-1 and Amity, known and unknown to the grand jury, submitted claims to Medicare for at least thirteen beneficiaries whom BHUPINDER BHANDARI had referred to Amity, with initials M.G., G.M., A.R., D.N., L.Z., M.K., B.C., S.P., B.S., P.O., R.P., B.K., P.S.

o. In or about July 2017, CC-1, Advent, employees of Advent, and other individuals acting at the direction of CC-1 and Advent, known and unknown to the grand jury, submitted claims to Medicare for at least eighteen beneficiaries whom BHUPINDER BHANDARI had referred to Advent, with initials: F.H., J.P., S.P., F.S., K.J.E., C.R., R.V., R.C., M.S., P.P., R.G., H.P., W.W., M.P., N.T., A.R., S.P., C.K.

p. On or about September 1, 2017, BHUPINDER BHANDARI and CC-1 exchanged messages in which they discussed, in sum and substance, among other things, BHUPINDER BHANDARI's referral of a particular patient, to which CC-1 responded: "OK more pls and hospice."

q. On or about April 26, 2018, BHUPINDER BHANDARI and CC-1 exchanged messages in which they discussed, in sum and substance, among other things, CC-1's request to BHUPINDER BHANDARI for a meeting at his house and to "Pls send me home Health and hospice Pls make sure I'm Number one," to which BHUPINDER BHANDARI responded, "[CC-1] Namaste. Will you have time to have tea with me at 4pm today or tomorrow. We can meet at my house. Thanks"

All in violation of Title 18, United States Code, Section 371.

## COUNTS TWO THROUGH FIVE

**Solicitation and Receipt of Kickbacks in Connection with a Federal Health Care Program**
**(42 U.S.C. § 1320a-7b(b)(1)(A) and 18 U.S.C. § 2)**

35. Paragraphs 1 through 34 are re-alleged and incorporated by reference as though fully set forth herein:

36. On or about the dates enumerated below, in the Northern District of California, and elsewhere, defendant BHUPINDER BHANDARI, and others, each aided and abetted by the other, did knowingly and willfully solicit and receive remuneration, that is kickbacks and bribes, directly and indirectly, overtly and covertly, in the form of checks, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program, as defined by Title 42, United States Code, Section 1320a-7b(f), that is Medicare, as set forth below:

| Count | Approximate Date of Check | Amount | Check |
|---|---|---|---|
| Two | April 3, 2017 | $3,000 | AMITY Wells Fargo Bank Account ending 3890, Check # 5374 |
| Three | April 6, 2017 | $3,000 | ADVENT Wells Fargo Bank Account ending 7516, Check # 0408 |
| Four | July 5, 2017 | $3,000 | AMITY Wells Fargo Bank Account ending 3890, Check # 5756 |
| Five | July 5, 2017 | $3,500 | ADVENT Wells Fargo Bank Account ending 7516, Check # 0531 |

All in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A) and Title 18, United States Code, Section 2.

**COUNT SIX**

**Solicitation and Receipt of Kickbacks in Connection with a Federal Health Care Program**
**(42 U.S.C. § 1320a-7b(b)(1)(A) and 18 U.S.C. § 2)**

37. Paragraphs 1 through 36 are re-alleged and incorporated by reference as though fully set

forth herein:

38. On or about June 22, 2017, in the Northern District of California and elsewhere, the defendant, BHUPINDER BHANDARI, and others, each aided and abetted by the other, did knowingly and willfully solicit and receive any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to wit, from a person purportedly representing a home health agency, in return for referring individuals to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program.

All in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A) and Title 18, United States Code, Section 2.

### COUNT SEVEN

**Solicitation and Receipt of Kickbacks in Connection with a Federal Health Care Program**
**(42 U.S.C. § 1320a-7b(b)(1)(A) and 18 U.S.C. § 2)**

39. Paragraphs 1 through 38 are re-alleged and incorporated by reference as though fully set forth herein:

40. On or about November 30, 2017, in the Northern District of California and elsewhere, the defendant, BHUPINDER BHANDARI, and others, each aided and abetted by the other, did knowingly and willfully solicit and receive any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to wit, from a person purportedly representing a home health agency, in return for referring individuals to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program.

All in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A) and Title 18, United States Code, Section 2.

### COUNT EIGHT

**False Statements to a Financial Institution**
**(18 U.S.C. §§ 1014 & 2)**

41. Paragraphs 1 through 40 are re-alleged and incorporated by reference as though fully set forth herein:

42. On or about September 23, 2019, in the Northern District of California, and elsewhere, the defendant, BHUPINDER BHANDARI, each aided and abetted by the other, knowingly made false statements for the purpose of influencing the actions of Mission National Bank, which was a financial institution insured by the FDIC, in connection with his application for a mortgage loan, to wit, BHUPINDER BHANDARI knowingly made what he knew were false statements and representations to Mission National Bank regarding his status as a defendant in a federal criminal case by representing that he was not a "party to any legal claims or lawsuits" and had not been "indicted or been subject to an investigation by the SEC or any other government agency," when, in truth, BHUPINDER BHANDARI knew he was a defendant in *United States v. Bhandari* (3:19-mj-71441), because he had personally appeared in court for his arraignment on the criminal complaint in the above case on September 5, 2019.

All in violation of Title 18, United States Code, Sections 1014 and 2.

## FORFEITURE ALLEGATION

### (18 U.S.C. §§ 981 and 982, and 28 U.S.C. § 2461(c))

43. The allegations contained in this Indictment are re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Sections 981 and 982 and Title 28, United States Code, Section 2461(c).

Upon conviction for any of the offenses set forth in Counts One through Seven of this Indictment, the defendant,

BHUPINDER BHANDARI,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), all property, real or personal, constituting or derived from gross proceeds traceable to the commission of the offense or offenses.

Upon conviction for the offense set forth in Count Eight of this Indictment, the defendant,

BHUPINDER BHANDARI,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all property, real or personal, which constitutes or is derived from proceeds traceable to the commission of the offense.

If any of the property described above, as a result of any act or omission of the defendant:

    a. cannot be located upon exercise of due diligence;
    b. has been transferred or sold to, or deposited with, a third party;
    c. has been placed beyond the jurisdiction of the court;
    d. has been substantially diminished in value; or
    e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to Title 18, United States Code, Sections 981 and 982; Title 28, United States Code, Section 2461(c); and Federal Rule of Criminal Procedure 32.2.

DATED: March 9, 2021                                                         A TRUE BILL.

                                                                            /s/
                                                          FOREPERSON

STEPHANIE M. HINDS
Acting United States Attorney

*/s/ Christoffer Lee*
CHRISTOFFER LEE
Assistant United States Attorney

# DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

**BY:** ☐ COMPLAINT    ☐ INFORMATION    ☒ INDICTMENT    ☒ SUPERSEDING

**OFFENSE CHARGED**

18 U.S.C. § 371 – Conspiracy to Pay and Receive Health Care Kickbacks;
42 U.S.C. § 1320a-7b(b)(1)(A) – Anti-Kickback Statute;
18 U.S.C. § 2 – Aiding and Abetting;
18 U.S.C. § 1014 – False Statements to a Financial Institution;
18 U.S.C. §§ 981(a)(1)(C) and 982(a)(7) and 28 U.S.C. § 2461(c) – Forfeiture Allegation

☐ Petty    ☐ Minor    ☐ Misdemeanor    ☒ Felony

**PENALTY:** See Attached

**Name of District Court, and/or Judge/Magistrate Location**
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

**DEFENDANT - U.S**
▶ BHUPINDER BHANDARI

**DISTRICT COURT NUMBER**
3:20-cr-00374-CRB

**FILED**
Mar 09 2021
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

## PROCEEDING

Name of Complaintant Agency, or Person (& Title, if any)
Federal Bureau of Investigation

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. ATTORNEY    ☐ DEFENSE

**SHOW DOCKET NO.**

☒ this prosecution relates to a pending case involving this same defendant

☒ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

**MAGISTRATE CASE NO.**
3:19-mj-71441-JCS

Name and Office of Person Furnishing Information on this form: Stephanie M. Hinds
☒ U.S. Attorney    ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned): Christoffer Lee

## DEFENDANT

**IS NOT IN CUSTODY**
1) ☐ Has not been arrested, pending outcome this proceeding. If not detained give date any prior summons was served on above charges ▶
2) ☐ Is a Fugitive
3) ☒ Is on Bail or Release from (show District)

**IS IN CUSTODY**
4) ☐ On this charge
5) ☐ On another conviction    ☐ Federal ☐ State
6) ☐ Awaiting trial on other charges
If answer to (6) is "Yes", show name of institution

Has detainer been filed? ☐ Yes ☐ No    If "Yes" give date filed

**DATE OF ARREST** ▶ Month/Day/Year
Or... if Arresting Agency & Warrant were not
**DATE TRANSFERRED TO U.S. CUSTODY** ▶ Month/Day/Year

☐ This report amends AO 257 previously submitted

## ADDITIONAL INFORMATION OR COMMENTS

**PROCESS:**
☐ SUMMONS    ☒ NO PROCESS*    ☐ WARRANT    Bail Amount: _____

If Summons, complete following:
☐ Arraignment    ☐ Initial Appearance
Defendant Address:

* Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time:    Before Judge:

Comments:

Attachment
Penalties for Superseding Indictment
<u>United States v. Geoffrey Henry Watson</u>
3:20-cr-00375-CRB

**18 U.S.C. § 371 – Conspiracy to Pay and Receive Health Care Kickbacks**
- Maximum Term of Imprisonment: 5 years
- Maximum Length of Supervised Release: 3 years
- Maximum Fine: $250,000 or twice the gross gain or loss
- Special Assessment of $100 per felony count
- Restitution
- Forfeiture

**42 U.S.C. § 1320a-7b(b)(1)(A) – Anti-Kickback Statute; 18 U.S.C. § 2 –Aiding and Abetting**
- Maximum Term of Imprisonment: 10 years
- Maximum Fine: $100,000 or twice the gross gain or loss
- Supervised Release Term: 3 years
- Mandatory Special Assessment: $100 per felony count
- Restitution
- Forfeiture

**18 U.S.C. § 1014 – False Statements to a Financial Institution; 18 U.S.C. § 2 –Aiding and Abetting**
- Maximum Term of Imprisonment: 30 years
- Maximum Length of Supervised Release: 5 years
- Maximum Fine: $1,000,000.00 or twice the gross gain or loss
- Special Assessment of $100 per felony count
- Restitution
- Forfeiture